United States Court of Appeals,

Fifth Circuit.

No. 89–2638.

Merritt E. JONES, on his behalf and as next friend of Pamela Jones, a child, et al., Plaintiffs–Appellants,

v.

CLEAR CREEK INDEPENDENT SCHOOL DISTRICT, Defendant–Appellee.

Nov. 24, 1992.

Appeal from the United States District Court for the Southern District of Texas.

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

Before REAVLEY, GARWOOD and BARKSDALE, Circuit Judges.

REAVLEY, Circuit Judge:

In *Jones v. Clear Creek Independent School Dist.,* 930 F.2d 416 (5th Cir.1991) (*Jones I* ), *vacated,* 505 U.S. ——, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992), we held that Clear Creek Independent School District's Resolution[1] permitting public high school seniors to choose student volunteers to deliver nonsectarian, nonproselytizing invocations at their graduation ceremonies does not violate the Constitution's Establishment Clause. In applying the tripartite test of *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), we reasoned that the Resolution has a secular purpose of solemnization, that the Resolution's primary effect is to impress upon graduation attendees the profound social significance of the occasion rather than advance or endorse religion, and that Clear Creek does not excessively entangle itself with religion

---

[1]The Resolution provides:

> 1. The use of an invocation and/or benediction at high school graduation exercise shall rest within the discretion of the graduating senior class, with the advice and counsel of the senior class principal;
>
> 2. The invocation and benediction, if used, shall be given by a student volunteer; and
>
> 3. Consistent with the principle of equal liberty of conscience, the invocation and benediction shall be nonsectarian and nonproselytizing in nature.

by proscribing sectarianism and proselytization without prescribing any form of invocation. *Jones I,* 930 F.2d at 419–23.

Then, in *Lee v. Weisman,* 505 U.S. ——, 112 S.Ct. 2649, 120 L.Ed.2d 467, 60 U.S.L.W. 4723 (1992), the Supreme Court held that Robert E. Lee, a public-school principal acting in accord with the policy of his Providence, Rhode Island school district, violated the Establishment Clause by inviting a local clergy member, Rabbi Leslie Gutterman, to deliver a nonsectarian, nonproselytizing invocation at his school's graduation ceremony. The Court reasoned that Lee's actions represent governmental coercion to participate in religious activities, a paradigmatic establishment of religion. The Court then granted certiorari in this case, vacated our judgment, and remanded it to us for further consideration in light of *Lee. Jones v. Clear Creek Independent School Dist.,* 505 U.S. ——, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992). Upon reconsideration, we hold that *Lee* does not render Clear Creek's invocation policy unconstitutional, and again affirm the district court's summary judgment in Clear Creek's favor.

## I. THE SUPREME COURT TELLS THIS COURT WHAT THE ESTABLISHMENT CLAUSE MEANS

Of the six forms of argument recognized in constitutional interpretation,[2] it is the doctrinal arguments that control Establishment Clause cases.[3] Although the Supreme Court's doctrinally-centered manner of resolving Establishment Clause disputes may be credited with accommodating a society of remarkable religious diversity, it requires considerable micromanagement of government's relationship to religion as the Court decides each case by distilling fact-sensitive rules from its precedents.

For example, in *Lynch v. Donnelly,* 465 U.S. 668, 681–82, 104 S.Ct. 1355, 1363–64, 79 L.Ed.2d 604 (1984), the Court compared the effect that a city's display of a nativity scene had on the advancement or endorsement of religion to the effect of governmental actions that it had considered

---

[2]*See* PHILIP BOBBITT, CONSTITUTIONAL FATE 7, 93–94 (1982) (defining six categories of legitimate constitutional argument: historical, textual, structural, prudential, doctrinal, and ethical).

[3]*See* PHILIP BOBBITT, CONSTITUTIONAL INTERPRETATION 18–20 (1991) (employing an Establishment Clause hypothetical to explain doctrinal argument).

in previous cases, and concluded that display of the nativity scene did not violate the Establishment Clause. *Id.* at 687, 104 S.Ct. at 1366. Then, in *County of Allegheny v. ACLU,* 492 U.S. 573, 598–600, 109 S.Ct. 3086, 3103–05, 106 L.Ed.2d 472 (1989), the Court held that a county's display of a nativity scene violated the Establishment Clause because, *inter alia,* it was surrounded by flora, instead of Santa Claus and reindeer as was the nativity scene at issue in *Lynch.*[4]

The Court has repeatedly held that the Establishment Clause forbids the imposition of religion through public education. That leads to difficulty because of public schools' responsibility to develop pupils' character and decisionmaking skills, a responsibility more important in a society suffering from parental failure. If religion be the foundation, or at least relevant to these functions and to the education of the young, as is widely believed, it follows that religious thought should not be excluded as irrelevant to public education. There is a deep public concern that radical efforts to avoid pressuring children to be religious actually teach and enforce notions that pressure the young to avoid all that is religious.[5]

Nevertheless, it is neither our object nor our place to opine whether the Court's Establishment Clause jurisprudence is good, fair, or useful. What the Establishment Clause finally means in a specific case is what the Court says it means. We sit only to apply the analytical methods sanctioned by the Court in accord with its precedent.

## II. FROM *LEMON* TO *LEE*

In *Jones I,* we applied *Lemon's* tripartite test[6] rather than the historical approach that the Court employed in *Marsh v. Chambers,* 463 U.S. 783, 792, 103 S.Ct. 3330, 3336, 77 L.Ed.2d 1019 (1983). *Jones I,* 930 F.2d at 419 (citing *Grand Rapids School Dist. v. Ball,* 473 U.S. 373, 383, 105

---

[4]Some say that the Court has thus found a "three plastic animals rule" in the Constitution. Michael W. McConnell, *Religious Freedom at a Crossroads,* 59 U.CHI.L.REV. 115, 127 (1992).

[5]*See Board of Educ. of Westside Community Schools v. Mergens,* 496 U.S. 226, 248, 110 S.Ct. 2356, 2371, 110 L.Ed.2d 191 (1990) ("if a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion").

[6]*Lemon* holds that, to satisfy the Establishment Clause, "a governmental practice must (1) reflect a clearly secular purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) avoid excessive government entanglement with religion." *Lee,* ⸺ U.S. at ⸺, 112 S.Ct. at 2654 (citations omitted).

S.Ct. 3216, 3222 (1985), and *Edwards v. Aguillard,* 482 U.S. 578, 583 n. 4, 107 S.Ct. 2573, 2577 n. 4, 96 L.Ed.2d 510 (1987)). The *Lee* Court agreed that *Marsh's* historical analysis is inappropriate, —— U.S. at ——, 112 S.Ct. at 2660, yet it considered *Lemon* analysis unnecessary to decide whether Lee violated the Establishment Clause.[7] The Court instead held Lee's actions unconstitutional under a coercion analysis. *Id.* —— U.S. at ——, 112 S.Ct. at 2655. At least four Justices would also hold that Lee's actions had the effect of unconstitutionally endorsing religion. *Id.* —— U.S. at ——, 112 S.Ct. at 2665 n. 9 (Blackmun, J., concurring), at ——, 112 S.Ct. at 2671–72 (Souter, J., concurring).

Thus, in the time between *Lemon* and *Lee,* the Court has used five tests to determine whether public schools' involvement with religion violates the Establishment Clause. To fully reconsider this case in light of *Lee,* we reanalyze the Resolution under all five tests that the Court has stated are relevant.[8] We address any statements in *Lee* that bear on our analysis in *Jones I* and apply *Lee's* coercion test for the first time.

A. SECULAR PURPOSE

Nothing in *Lee* abrogates our conclusion that the Resolution has a secular purpose of solemnization, and thus satisfies *Lemon's* first requirement. *See Jones I,* 930 F.2d at 419–21. The Resolution represents Clear Creek's judgment that society benefits if people attach importance to graduation. A meaningful graduation ceremony can provide encouragement to finish school and the inspiration and self-assurance necessary to achieve after graduation, which are secular objectives.

The *Lee* Court stated that the Providence school district's solemnization argument would

---

[7]The Court stated:

> We can decide th[is] case without reconsidering the general constitutional framework by which public schools' efforts to accommodate religion are measured. Thus we do not accept the invitation of [Lee] and *amicus* the United States to reconsider our decision in *Lemon*....

*Id.* —— U.S. at ——, 112 S.Ct. at 2655; *but cf. id.* —— U.S. at ——, 112 S.Ct. at 2685 (Scalia, J., dissenting) (equating Court's neglect of *Lemon* with rejection).

[8]*See Lynch,* 465 U.S. at 679, 104 S.Ct. at 1362 (Establishment Clause "erects a "blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship' " and Court is "unwilling[ ] to be confined to any single test or criterion in this sensitive area") (citations omitted); *Lee,* —— U.S. at ——, 112 S.Ct. at 2661 ("Establishment Clause jurisprudence remains a delicate and fact sensitive one").

have "considerable force were it not for the constitutional constraints applied to state action...." ⸺ U.S. at ⸺, 112 S.Ct. at 2660. The Court did not question its members' previous acknowledgements that solemnization is a legitimate secular purpose of ceremonial prayer. *See Allegheny,* 492 U.S. at 595 n. 46, 109 S.Ct. at 3102 n. 46; *id.* at 630, 109 S.Ct. at 3120–21 (O'Connor, J., concurring); *Lynch,* 465 U.S. at 693, 104 S.Ct. at 1369–70 (O'Connor, J., concurring); *see also Engel v. Vitale,* 370 U.S. 421, 435 n. 21, 82 S.Ct. 1261, 1269 n. 21, 8 L.Ed.2d 601 (1962). Thus, we take the *Lee* Court to agree with our holding in *Jones I* that a law may pass *Lemon's* secular-purpose test by solemnizing public occasions, yet still be stricken as an unconstitutional establishment under another test mandated by the Court. *See Jones I,* 930 F.2d at 420.

## B. PRIMARY EFFECT

In *Jones I,* we held that the Resolution's *primary* effect was to solemnize graduation ceremonies, not to "advance religion" in contravention of *Lemon's* second requirement. 930 F.2d at 421–22. *Lee* calls into question three statements that we made in support of our advancement holding. We stated that graduating high school seniors would be less easily influenced by prayer than would be their junior schoolmates, *id.* at 421, but the Court held that all students under school supervision would be unduly influenced by Rabbi Gutterman's prayers. *Lee,* ⸺ U.S. at ⸺, 112 S.Ct. at 2658. We distinguished the graduation setting from the classroom setting because parents and guests are present only at graduation and school officials can pay much greater attention to individual students in the classroom than at graduation, *Jones I,* 930 F.2d at 422, but the Court stated that the two settings are "analogous." *Lee,* ⸺ U.S. at ⸺, 112 S.Ct. at 2660. We stated that the brevity and infrequency of the permissible prayers under the Resolution tempered any advancement of religion, *Jones I,* 930 F.2d at 422, but the Court rejected a *de minimis* characterization of the brief prayers at issue in *Lee.* ⸺ U.S. at ⸺, 112 S.Ct. at 2659.

*Lee* commands that we not rely on these three points in deciding whether the Resolution's primary effect is to advance religion. Yet even without them, we remain convinced that the Resolution's primary effect is to solemnize graduation ceremonies.

The Resolution can only advance religion by increasing religious conviction among graduation attendees, which means attracting new believers or increasing the faith of the faithful. Its requirement that any invocation be nonsectarian and nonproselytizing minimizes any such advancement of religion. The *Lee* Court held that the nonsectarian nature of the prayers there at issue did not change the fact that Lee directed graduation attendees to participate in a religious exercise. —— U.S. at ——, 112 S.Ct. at 2656; *see also id.* at ——, 112 S.Ct. at 2667–71 (Souter, J. concurring). Nevertheless, the nonsectarian nature of a prayer remains relevant to the extent to which a prayer advances religion.

The fact that *Lemon* only condemns government action that has the *primary* effect of advancing religion, *see Lemon,* 403 U.S. at 612, 91 S.Ct. at 2111, requires us to compare the Resolution's secular and religious effect. The Resolution may or may not have any religious effect. The students may or may not employ the name of any deity; heads may or may not be bowed; indeed, an invocation may or may not appear on the program. If the students choose a nonproselytizing, nonsectarian prayer, the effect may well marshall attendees' extant religiosity for the secular purpose of solemnization; but no one would likely expect the advancement of religion by the initiation or increase of religious faith through these prayers. The Resolution's primary effect is secular.

C. ENTANGLEMENT

We held in *Jones I* that the Resolution's proscription of sectarianism does not, of itself, excessively entangle government with religion. We know of no authority that holds yearly review of unsolicited material for sectarianism and proselytization to constitute excessive entanglement. *Cf. Weisman v. Lee,* 908 F.2d 1090, 1095 (1st Cir.1990) (Bownes, J., concurring) (finding excessive entanglement where school district directs that a prayer be given, chooses a clergy member to deliver the prayer, and requests that prayer be nonsectarian and nonproselytizing), *aff'd,* —— U.S. ——, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992); *id.,* at ——, 112 S.Ct. at 2617 (Souter, J. concurring) (state decisions as to sectarianism constitute illicit comparative theology). Moreover, nothing in *Lee* abrogates our reading of the Court's entanglement precedent to limit violative entanglement to *institutional* entanglement. *Jones I,* 930 F.2d at 423 (citing, *inter alia, Lynch,* 465 U.S. at 689, 104

S.Ct. at 1368 (O'Connor, J., concurring)). That a rabbi wrote and delivered the prayer at issue in *Lee* makes entanglement analysis relevant to that case, but the Resolution keeps Clear Creek free of all involvement with religious institutions.

## D. ENDORSEMENT

Like *Lemon's* advancement test, the Court's endorsement analysis focuses on the *effect* of a challenged governmental action. This is why, perhaps mistakenly, we conflated advancement and endorsement analysis in *Jones I.* Because the Court has never tolerated a government endorsement of religion that is incidental to a primary secular effect, as it has with incidental religious advancements, we will not now compare endorsement to legitimate effects of the Resolution. *See Allegheny,* 492 U.S. at 595 & n. 46, 109 S.Ct. at 3102 & n. 46 (Justice Blackmun, writing for himself and Justice Stevens, rejects any and all government endorsement of religion).

From the Court's various pronouncements, we understand government to unconstitutionally endorse religion when a reasonable person would view the challenged government action as a disapproval of her contrary religious choices. *See Lee,* —— U.S. at ——, 112 S.Ct. at 2665 n. 9 (Blackmun, J., concurring) (unconstitutional endorsement when "government makes adherence to religion relevant to a person's standing in the political community") (quoting *Wallace v. Jaffree,* 472 U.S. 38, 69, 105 S.Ct. 2479, 2496, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring)); *Allegheny,* 492 U.S. at 631, 109 S.Ct. at 3121 (O'Connor, J., concurring) ("The question under endorsement analysis ... is whether a reasonable observer would view [government action] as a disapproval of his or her particular religious choices....").

We may compare the Resolution to the facts in two somewhat similar cases where members of the Court discussed endorsement of religion. Both *Lee* concurrences consider invocations directed by Lee to be unconstitutional endorsements of religion. —— U.S. at ——, 112 S.Ct. at 2665–66 (Blackmun, J., concurring); *id.* at ——, 112 S.Ct. at 2677–78 (Souter, J., concurring). These concurrences attracted the votes of four Justices,[9] including Justice O'Connor, who first articulated

---

[9]Justice Kennedy, writing for the Court, took no position on endorsement in *Lee.* Justice Scalia, writing for the four dissenters, found no endorsement on the facts in *Lee. Id.* —— U.S. at ——, 112 S.Ct. at 2683–84 (Scalia, J., dissenting).

the endorsement test for the Court in *Lynch,* 465 U.S. at 688–89, 104 S.Ct. at 1367 (O'Connor, J., concurring). On the other hand, a plurality of the Court recently held that a public school does not unconstitutionally endorse religion by permitting a Christian club to meet on school grounds after class and recruit members through the school's newspaper, bulletin boards, public address system, and annual Club Fair, as long as the school accords equal privileges to other noncurriculum-oriented student organizations. *See Board of Educ. of Westside Community Schools v. Mergens,* 496 U.S. 226, 247–53, 110 S.Ct. 2356, 2370–73, 110 L.Ed.2d 191 (1990).

To compare the Resolution with *Lee* and *Mergens,* we consider exactly what it does. Unlike the policy at issue in *Lee,* it does not mandate a prayer. The Resolution does not even mandate an invocation; it merely permits one if the seniors so choose. Moreover, the students present Clear Creek with *their* proposed invocation under the Resolution, while in *Lee* the school explained its idea for an invocation to a member of an organized religion and directed him to deliver it. —— U.S. at ——, 112 S.Ct. at 2652–53. The Resolution is passive compared to the governmental overture toward religion at issue in *Lee.*

Concerning endorsement, the instant case more closely parallels *Mergens* because a graduating high school senior *who participates in the decision as to whether her graduation will include an invocation by a fellow student volunteer* will understand that any religious references are the result of student, not government, choice. The *Mergens* plurality states the point directly:

> there is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect. We think that secondary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis.

496 U.S. at 250, 110 S.Ct. at 2372. In *Jones I,* we recognized that invocations permitted by the Resolution "may" include supplication to a deity. 930 F.2d at 417 n. 1. But the Resolution permits invocations free of all religious content, and the 1987 student proposal was acceptable to the plaintiff-appellants. *See id.* at 420 n. 3. The record does not disclose how each senior class chooses

whether to include an invocation nor how the student volunteer who delivers the speech is chosen.[10] We can imagine discriminatory methods of implementing the Resolution that would make it a tool for governmental endorsement of religion, but the Resolution itself is constitutional unless there is no way to implement it on a nondiscriminatory basis.

We think that Clear Creek does not unconstitutionally endorse religion if it submits the decision of graduation invocation content, if any, to the majority vote of the senior class. Clear Creek is legitimately concerned with solemnizing its graduation ceremonies, and the Resolution simply permits each senior class to decide how this can best be done. School districts commonly provide similarly secular criteria for the selection of other student graduation speakers, and no court has held that their religious speech at graduation represents government endorsement of religion.[11] *Cf. Guidry v. Broussard,* 897 F.2d 181, 182 (5th Cir.1990) (relying on defendants' immunity to avoid deciding whether school liable for censoring valedictorian's religious graduation address). After participating in a student determination of what kind of invocation their graduation will contain, we do not believe that students will perceive any more government endorsement of religion from the Resolution than do students in Westside Community schools who are regularly recruited during school hours to join a Christian club. Clear Creek students certainly perceive a less-direct relationship between state and religion under the Resolution than Providence students did before *Lee. See Lee,* —— U.S. at ——, 112 S.Ct. at 2661 ("[A]t graduation time and throughout the course of the educational process, there will be instances when religious values, religious practices, and religious persons will have some interaction with the public schools and their students.") (citing *Mergens* ). We find no unconstitutional endorsement.

E. COERCION

---

[10]The appellants ask us to remand this case so that they can adduce evidence of unconstitutional applications of the Resolution. We understand our present task to be limited to determination of the Resolution's facial constitutionality, and nothing in this case prevents the appellants from filing a declaratory judgment action if they believe that the Resolution has been unconstitutionally applied. *See Jones I,* 930 F.2d at 423–24.

[11]That some attendees choose to stand and remain silent during an invocation is indistinguishable from their decision to accord a standing ovation to a moving valedictory address with religious inferences.

Instead of directly considering any of the tests that we have previously discussed, the *Lee* Court invalidated the Providence school district's policy on its evaluation of the coercive effect of Lee's actions. The Court held that Lee *coerced* graduation attendees to join in a formal religious exercise. *Lee,* at ——, 112 S.Ct. at 2655. The Court summarized its entire analysis of the constitutionality of the school policy at issue in *Lee* as follows:

> These dominant facts mark and control the confines of our decision: State officials direct the performance of a formal religious exercise at promotional and graduation ceremonies for secondary schools. Even for those students who object to the religious exercise, their attendance and participation in the state-sponsored religious activity are in a fair and real sense obligatory....

*Id.* Thus, *Lee* identifies unconstitutional coercion when (1) the government directs (2) a formal religious exercise (3) in such a way as to oblige the participation of objectors. *See also Mergens,* 496 U.S. at 261, 110 S.Ct. at 2378 (Kennedy, J., concurring) ("The inquiry with respect to coercion must be whether the government imposes pressure upon a student to participate in a religious activity."). Before *Lee,* no one contended that the Resolution coerced participation in prayer at Clear Creek's graduation ceremonies, and we failed to appreciate the need to address this issue from the Court's precedent that we discussed in *Jones I.* Upon considering this case in light of *Lee's* coercion analysis, we find that the Resolution does not succumb to one, let alone all three, of the elements of unconstitutional coercion, and thus survives the analysis that felled graduation prayer in *Lee.*

*1. Direction*

On every single one of the seven pages that comprise *Lee* 's entire coercion analysis, the Court stresses the government's direct and complete control over the graduation prayers there at issue as determinative of the establishment question. *E.g.,* —— U.S. at ——, 112 S.Ct. at 2655 ("[G]overnment involvement ... is pervasive, to the point of creating a state-sponsored and state-directed religious exercise in a public school [which] suffices to determine the [constitutional] question...."); *id.* at ——, 112 S.Ct. at 2656 (First Amendment does not "permit the government to undertake [the task of defining common ground necessary for the spiritual development of humankind] for itself"); *id.* at ——, 112 S.Ct. at 2657 ("The degree of school involvement here made it clear that the graduation prayers bore the imprint of the State...."); *id.* at ——, 112 S.Ct. at 2658

("[I]f citizens are subjected to state-sponsored religious exercises, the State disavows its own duty to guard [its people's freedom of conscience]."); *id.* (a graduating senior at a Providence graduation ceremony would have "a reasonable perception that she is being forced by the State to pray"); *id.* at ⸻, 112 S.Ct. at 2659 ("[T]he State ... in effect required participation in a religious exercise."); *id.* at ⸻, 112 S.Ct. at 2660 ("[T]he state-imposed character of an invocation and benediction by clergy selected by the school combine to make the prayer a state-sanctioned religious exercise...."); *id.* at ⸻, 112 S.Ct. at 2661 ("The prayer exercises in this case are especially improper because the State has in every practical sense compelled attendance and participation in an explicit religious exercise....").

The Court deplored three instances of government involvement in graduation prayer in *Lee,* none of which is tolerated, let alone prescribed, by the Resolution. First, the Court found that Lee "decided that an invocation and benediction should be given; this is a choice attributable to the State, and from a constitutional perspective it is as if a state statute decreed that the prayers must occur." *Id.* at ⸻, 112 S.Ct. at 2655. The Resolution requires that the state *not* decide whether an invocation will occur; it respects the graduating class's choice on the matter. The Resolution acknowledges that a school official may offer "advice and counsel" to the senior class in deciding whether to include invocations at graduation, and officials could exploit this clause to impose their will on the students. But, again,[12] in evaluating the Resolution's facial constitutionality, we are only concerned with whether the Resolution necessarily charges government with the decision of whether to include invocations. Unlike the policy at issue in *Lee,* the Resolution does not.

Second, the Court was critical of the fact that "[t]he principal chose the religious participant, here a rabbi, and that choice is also attributable to the State." *Id.* In contrast, the Resolution explicitly precludes anyone but a student volunteer from delivering Clear Creek's invocations. Moreover, the Resolution says nothing of government involvement in the selection of the person who delivers any invocation. That the government can remain detached from this selection consistent with the Resolution maintains the Resolution's facial constitutionality.

---

[12]*See supra* note 10 and accompanying text.

The Court recognized that Lee completed his control over the invocation at his school's graduation ceremonies when he "provided Rabbi Gutterman with a copy of the "Guidelines for Civic Occasions,' and advised him that his prayers should be nonsectarian." *Id.* at ——, 112 S.Ct. at 2656. In three respects, Clear Creek exercises significantly less control over the content of invocations at its schools. Clear Creek does not solicit invocations; the Resolution only forbids Clear Creek schools from *accepting* sectarian or proselytizing invocations. Moreover, because a graduating senior drafts proposed invocations each year under the Resolution, the same person will never repeatedly propose an invocation. *Compare id.* (noting that Lee could refine an official prayer by repeatedly inviting the same clergy member to deliver invocations). Finally, the Resolution imposes two one-word restrictions, which enhance solemnization and minimize advancement of religion, instead of a pamphlet full of invocation suggestions.

We conclude that Clear Creek does not direct prayer presentations at its graduation ceremonies.

*2. Religiosity*

Lee directed Rabbi Gutterman to pray, and the Court characterized this as a "formal religious observance." *Id.* at ——, 112 S.Ct. at 2655. By contrast, the Resolution tolerates nonsectarian, nonproselytizing prayer, but does not require or favor it.

*3. Participation*

The *Lee* Court held that government-mandated prayer at graduation places a constitutionally impermissible amount of psychological pressure upon students to participate in religious exercises. *Id.* at ——, 112 S.Ct. at 2658–59. We think that the graduation prayers permitted by the Resolution place less psychological pressure on students than the prayers at issue in *Lee* because all students, *after having participated in the decision of whether prayers will be given,* are aware that any prayers represent the will of their peers, who are less able to coerce participation than an authority figure from the state or clergy.

We also consider the age of the graduating seniors relevant to the determination of whether prayers under the Resolution can coerce these young people into participating in a religious exercise.

*See Jones I,* 930 F.2d at 421. *Lee* explains that *the state-initiated clergy prayers there at issue* have a coercive effect on public-school students regardless of age, *see* —— U.S. at ——, 112 S.Ct. at 2658–59, but it nowhere compromises the Court's previous recognition that graduating seniors "are less impressionable than younger students." *Mergens,* 496 U.S. at 235–37, 110 S.Ct. at 2364–65 (approving Congress' extension of the Court's reasoning in *Widmar v. Vincent,* 454 U.S. 263, 274 n. 14, 102 S.Ct. 269, 276–77 n. 14, 70 L.Ed.2d 440 (1981), that age is inversely proportional to impressionability, from university students to secondary school students); *see also id.* 496 U.S. at 250, 110 S.Ct. at 2372 (endorsing Justice Powell's dissent in *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 556, 106 S.Ct. 1326, 1339, 89 L.Ed.2d 501 (1986)).

Accordingly, we think that the coercive effect of any prayer permitted by the Resolution is more analogous to the innocuous "God save the United States and this Honorable Court" stated *by and to* adults than the government-mandated message delivered to young people from church authority that the Court considered in *Lee. Cf. Lee,* —— U.S. at ——, 112 S.Ct. at 2659 (refusing to "address whether [the choice between participation and protest] is acceptable if the affected citizens are mature adults").[13]

None of *Lee's* three elements of coercive effect exist here. Prayers allowed under the Resolution do not unconstitutionally coerce objectors into participation.

### III. FROM SEA TO SHINING SEA, GREAT GOD OUR KING[14]

---

[13]Nor did the Court criticize the fact that, before Rabbi Gutterman delivered the prayers ordered by Lee, the assembly stood for the Pledge of Allegiance, which of course recounts our subjugation to a deity. *See id.* —— U.S. at ——, 112 S.Ct. at 2653; *id.* at ——, 112 S.Ct. at 2682 (Scalia, J., dissenting).

[14]America! America! God shed His grace on thee,

And crown thy good with brotherhood

From sea to shining sea.

*America the Beautiful*

Long may our land be bright.

With freedom's holy light;

The practical result of our decision, viewed in light of *Lee,* is that a majority of students can do what the State acting on its own cannot do to incorporate prayer in public high school graduation ceremonies. In *Lee,* the Court forbade schools from exacting participation in a religious exercise as the price for attending what many consider to be one of life's most important events. This case requires us to consider *why* so many people attach importance to graduation ceremonies. If they only seek government's recognition of student achievement, diplomas suffice. If they only seek God's recognition, a privately sponsored baccalaureate will do. But to experience the *community's* recognition of student achievement, they must attend the public ceremony that other interested community members also hold so dear. By attending graduation to experience and participate in the community's display of support for the graduates, people should not be surprised to find the event affected by community standards. The Constitution requires nothing different.[15]

We again affirm the district court's judgment denying injunctive and declaratory relief from the Resolution.

AFFIRMED.

---

Protect us by Thy might,

Great God, our King.

*America*

[15]*Cf. Employment Div., Dept. of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).